# EXHIBIT 13

```
                                    )        Affidavit of
                                    )       Ms. Anastasia Alt
                                    )      Manager, Recoop LLC
JoAnn LeDoux v. Outliers, Inc. et al )
                                    )
                                    )
                                    )        8  May 2025
```
_____

Pursuant to 28 U.S.C. § 1746, I affirm the following:

I am Anastasia Alt. I am over eighteen years old and have personal knowledge of the information contained below.

Upon learning of the pending litigation, I became aware that I possessed truthful and material evidence relevant to the claims being asserted. I submit this affidavit in good faith, and in furtherance of the public interest, including the disclosure of information regarding potential violations of law and risks to public health. My sole purpose in providing this information is to assist the Court in evaluating the facts, not to disparage any individual or entity.

I am a manager and the majority shareholder of the company called Recoop LLC ("Recoop"). I co-founded this organization in approximately 2018. Recoop is not and has never been a party to any agreement whatsoever, written or verbal, with Outliers, Inc. dba Thesis Nootropics ("Outliers" or "Thesis"); no contractual relationship of any kind exists or has ever existed between Recoop and Outliers.

<u>Background Information re Outliers, Inc. dba Thesis -</u>

Daniel Freed created Outliers Inc. in approximately 2017. Outliers operated under the business name "PlaceboProof" initially to sell nootropic supplements. My understanding is that in or around the end of 2019, PlaceboProof changed its name to "Formula" or "FindMyFormula." My understanding is that by the end of 2021, Mr. Freed re-branded his company to "TakeThesis" or "Thesis."

I have a prior professional relationship with Daniel Freed, the CEO of Outliers. Mr. Freed was formerly a manager and shareholder of Recoop, from 2018 until February 2020.

Significantly, while Mr. Freed was a manager of Recoop, he used the email address danfreed1@gmail.com to perform work on behalf of Recoop. Mr. Freed acknowledged his use of this specific email address when performing work for Recoop in a sworn declaration he submitted in litigation between Outliers and Recoop. Attachment A – Mr. Freed Affidavit in Recoop Litigation.

<u>Thesis Purchase Agreement -</u>

In the same litigation between Recoop and Outliers, a purchase agreement with Outliers regarding the shares I received in my individual capacity for performing advisory services for Outliers was filed publicly as Exhibit 3 to ECF No. 13 in Case No. 1:24-cv-01810-LJL (S.D.N.Y.) and is part of the public

federal court record. I signed this document in my personal capacity as the seller in the Thesis Purchase Agreement dated March 9, 2021, which Mr. Freed signed on behalf of Thesis as well. Recoop was not and is not a party to the Thesis Purchase Agreement. I can validate that the copy of the document that is attached is a true and correct copy of the Thesis Purchase Agreement. Attachment B – Thesis Purchase Agreement.

The Thesis Purchase Agreement contains a confidentiality clause barring me from disclosing the terms of the purchase agreement itself or the events from which it arose, but it does not limit my legal ability to defend against claims concerning any present or ongoing legal obligations of confidentiality with Thesis. The Thesis Purchase Agreement has now been made publicly available as part of ongoing documents in federal litigation.

Separate from the manager and shareholder relationship between Recoop and Mr. Freed, I had a business relationship with Outliers wherein I acted as an advisor in their business. According to the Thesis Purchase Agreement, in February 2020 or the same month that Mr. Freed left Recoop, Thesis and I separately and voluntarily terminated our advisory services agreement and expressly waived the fifteen (15) day written notice period upon termination. The Thesis Purchase Agreement does not include *any* language preserving *any* continuing obligations, of confidentiality or any other kind, under the

2018 advisor agreement. The Thesis Purchase Agreement contains a general release of Thesis from me.

The 2018 advisor agreement between Thesis and myself is not publicly available. I have not disclosed any proprietary information that I received while serving in my capacity as an advisor to Outliers before that agreement was voluntarily terminated by both parties on or about February 29, 2020. I have not waived and expressly maintain my right to all immunities afforded under 18 U.S.C. § 1833(b).

The "_Standup Document" -

In 2023, in my capacity as a manager of Recoop, I discovered, for the first time, the weblink for the "Standup Document" in the biz@getrecoop.com Google account belonging to Recoop. To clarify, I received the Standup Document in 2023 from Recoop, which accessed it through a Google Docs link provided to Recoop by Mr. Freed in January 2020 and connected to Mr. Freed's danfreed1@gmail.com account—the same account he used for Recoop-related work. I did not access the "Standup Document" via Thesis' corporate systems, nor did I access it through any account relevant to my former advisory work for Thesis.

Mr. Freed created the Google document in the danfreed1@gmail.com Google account on February 4, 2018, entitled "_Standup." Attachment C – February 2018 Creation of _Standup Document. The biz@getrecoop.com Google account is Recoop's

primary business account for marketing data and analytics, which Mr. Freed worked on while he was a manager of Recoop before he left as described in his Recoop Lawsuit Affidavit. Recoop obtained the "Standup Document" while conducting research into potential breaches of Mr. Freed's former and ongoing contractual obligations to Recoop, as well as allegations of marketing data misappropriation, which later became the subject of a lawsuit against Thesis in the Southern District of New York and a lawsuit against Freed in the State Court of New York.

Specifically, Recoop located the "Standup Document" in the "Recent" view within the Google Drive document folder connected to the biz@getrecoop.com Google account. The Recent view displays files a Google account has previously opened or interacted with for access, without separately storing copies of those files in Google Drive. Significantly, the access settings to the Standup Document demonstrated anyone in the public could access the document with the corresponding weblink; the document was not private, nor did it contain any visible watermarks on its pages or disclaimers of confidentiality. Once provided the corresponding web link, anyone could download the Standup Document. *See* Attachment C, "viewers can download."

According to Google's publicly available documentation, "[y]ou can see changes that have been made to a document in Google Docs, Sheets, Slides, or Vids" and "[a]t the top right

[of a Google Document], hover over Last edit Version history to see who was the last person to update the file and when they last made changes." From my review of the publicly available version history of the "Standup Document," Mr. Freed changed the access permissions of the "Standup Document" on at least two occasions.

On August 7, 2018, Mr. Freed clicked at 7:24:18 PM to modify the access settings of the corresponding weblink to the "Standup Document" such that "[a]nyone on the internet with the link" could view the Google document. Attachment D – Standup Document Shared with Anyone on Internet.

On August 7, 2018, Mr. Freed clicked at 7:24:22 PM to modify the access settings of the corresponding weblink to the "Standup Document" such that "[a]nyone on the internet with the link" could edit, including download, the Google document. *See* Attachment D.

Google's published documentation confirms that "[b]y default, general access [of Google Documents] is set to [r]estricted. This is the recommended setting for most users, so they can share a file only when they're ready and keep personal files private." Attachment E – Google Permissions.

On or before January 22, 2020, Mr. Freed navigated in his web browser to the web link for the "Standup Document" while performing work for Recoop and logged into biz@getrecoop.com.

Mr. Freed thereby provided Recoop the web link to the "Standup Document," and in doing so, granted Recoop permission to access, view, edit, and thus, to download a copy of the "Standup Document."

Recoop downloaded a copy of the "Standup Document" from the publicly available web link Mr. Freed previously provided in 2020 to Recoop on December 14, 2023. Attachment F – Record of Download.

On or about December 14, 2023, prior to initiating the Recoop Lawsuit, Recoop sent an email to Mr. Freed and Thesis attaching a downloaded copy of the "Standup Document" as a Microsoft Word document. This email informed Mr. Feed that Recoop was aware of the "Standup Document" associated with the email address of danfreed1@gmail.com and that it appeared to be highly relevant to the dispute between Recoop and Outliers.

On January 3, 2024, Mr. Freed replied to Recoop's December 14, 2023, email and alluded to attorney communication.

No confidentiality provision, nor any other clause in any agreement or contract, precludes Recoop from providing a copy of the "Standup Document" in any claims against Thesis, in any claims against Mr. Freed, nor to Ms. LeDoux's attorneys.

On February 22, 2025, I first learned of Ms. LeDoux's lawsuit against Thesis via a Google alert email for "daniel freed nootropics" that was passively monitoring activity by Mr.

Freed in the news, as any such activity could be relevant to the ongoing litigation between Recoop, Thesis, and Mr. Freed. A copy of that Google alert email is attached as Attachment P.

Through its counsel, Recoop provided the Standup Document to counsel for Ms. JoAnn LeDoux on or about March 8, 2025, after the Plaintiff's counsel interviewed me the same day about how Recoop had obtained its copy, which Recoop did at the publicly available web link to the "Standup Document" that Mr. Freed had earlier provided Recoop on or before January 22, 2020, as shown in the "Loom Video".

<u>Relevance of the "_Standup document"</u>

The "Standup Document" contains information about

The "Standup Document" also contains notations about

. The "Standup Document" also lists information about

.

There are notes in the "Standup Document" about

I am aware from the public court

record that both Mr. Anand and Ms. Lujajohnson provided declarations about their assertions of the contents of the FindMyFormula website CartHook checkout page pertinent to the LeDoux litigation. I am also aware from the public court record that their declarations do not disclose any potential, ongoing equity relationship, or lack thereof, with Outliers, Inc. dba Thesis. I have no direct knowledge of any such ongoing equity stakeholder relationship, or lack thereof, between Anand, Lujajohnson, and Outliers. Having reviewed Thesis' job openings, I am aware that Mr. Freed routinely offers equity stakes in Thesis to employees. From my experience in startup companies, equity compensation is fairly commonplace in the industry.

The "Loom Video" -

While Mr. Freed was acting as a manager of Recoop, on January 22, 2020, Mr. Freed created a screen-recorded video of a Google customer support video meeting he initiated on behalf of Recoop. In this video meeting, Mr. Freed seeks assistance regarding how to insert Google pixels or tags that assist e-commerce businesses to understand the online behavior of their customers and potential customers.

The screen-recorded video is internally dated at timestamp 00:04 when Mr. Freed closes out his ShipStation account for Formula customer purchases. Attachment G – Screen Capture 00:04 of Loom Video. This video has come to be referred to as the

"Loom Video" because it was created in a Loom account, which means Mr. Freed used the Loom video recording software to create and then host the video for viewing and download by anyone with the corresponding web link on Loom's website.

Attachment I is a transcript of the audio from the "Loom Video" that also captures user activity.

The "Loom Video" consists of Mr. Freed talking with the Google representative and performing a series of acts at the representative's instruction. I recognize his voice from having known Mr. Freed for many years. In watching the video, I can also recognize the names of individuals, including myself, with whom Mr. Freed sends iMessages and messages with other Recoop contractors while he is on hold with the Google customer service representative. During the video's screen capture, Mr. Freed has an internal Recoop messenger, Slack, open and is typing to communicate about his work with Recoop.

At other times during the "Loom Video," Mr. Freed is showing the Google representative the capabilities of CartHook for Formula and specifically guides him through the capabilities of the live CartHook checkout page for FindMyFormula.com.

Mr. Freed created the "Loom Video" in his capacity as a (now former) manager of Recoop. Mr. Freed stated in his Recoop Lawsuit Affidavit that he was working in the "Loom Video" to insert HTML code for Google pixel / Google tag IDs for the benefit of Recoop, such that Recoop could track customer activity on its website and collect customer data.

On March 7, 2024, Recoop filed a lawsuit against Thesis in the United States District Court for the Southern District of New York, captioned *Recoop LLC v. Outliers Inc., et al.*, Civil Action No. 1:24-cv-01810-LJL (the "Recoop Lawsuit") in which Recoop alleged data misappropriation against Thesis via marketing pixels and tags. Recoop alleges within that complaint that the information gained from the specific Google pixel / Google tag ID that Mr. Freed positively identifies in the "Loom Video" while working for Recoop was used to benefit Outliers.

At timestamp 52:04, toward the end of the "Loom Video," it is plainly visible and audible that Mr. Freed clicks the HTML code for the Google tag, presumably to right-click and copy the code. Attachment J – HTML Code Cursor. Next, Mr. Freed begins to navigate in his web browser to open the "Standup Document" to presumably paste the HTML code into the "Standup Document." Attachment K – Mr. Freed Navigates to Google "Standup Document." The Recoop website code appears on page 50 of 65 of the "Standup Document" and is the property of Recoop.

The link to Formula's CartHook website checkout page also appears on page 50 of 65 of the "Standup Document," but it will not generate the checkout page on any device other than presumably one in which a permissioned user is logged into the Outliers CartHook account.

The link to the "Loom Video" also appears on page 50 of 65 of the Standup Document and is the property of Recoop. This weblink is still active at least as of April 26, 2025, for anyone who clicks it to view and download the Loom Video.

In a sworn declaration filed in the Recoop Lawsuit on December 13, 2024, Mr. Freed admitted that he created the "Loom Video" to "troubleshoot issues related to the Google Tag's [the Tag] installation on Recoop's website with representatives of Google" (*See* Attachment A. Page 4, paragraph 17). Mr. Freed's Affidavit also avers that "[t]his meeting with Google support is the Loom video that I screen-recorded to ensure that Recoop would have the information for installing or troubleshooting the pixels provided by Google support to me [Mr. Freed] during this [January 22, 2020] meeting." (Emphasis Added). Mr. Freed's Recoop Lawsuit Affidavit is also available in the federal Pacer filings as Exhibit 13 to Document Number 96.

In Freed's Recoop Lawsuit Affidavit, Mr. Freed confirms that the "... email address of "danfreed1@gmail.com" … is the

email address I [Mr. Freed] was using to perform work for
Recoop…" (See Attachment A, Page 5, paragraph 19).

Regarding the January 22, 2020, "Loom Video" that Mr. Freed
recorded of his computer screen using the danfreed1@gmail.com
Loom account as he described in his Recoop Lawsuit Affidavit, I
can also offer the following additional information: Loom
provides privacy settings that allow users to limit access to
their videos to designated individuals, ensuring that recordings
are viewable only by intended recipients and not accessible to
the general public. According to Loom's publicly available
documentation:

> Sharing with specific people provides an extra layer of
> video security. If your video contains sensitive
> information and you'd like to make sure only a specific
> person (or group of people) can watch your video you can
> enable these features. This way you can be sure your Loom
> recording will only be seen by those it's intended for.
> This works in a similar way to sharing a Google Doc.

Attachment L – Loom Sharing.

At some point on or before January 12, 2024, Mr. Freed
modified the access settings of the corresponding "Loom Video"
weblink for the screen recording described in Mr. Freed's Recoop
Lawsuit Affidavit such that "Anyone on the internet with the
link" could view and download it as an MP4 video file.

The "Loom Video" screen recording described in Mr. Freed's
Recoop Lawsuit Affidavit remained accessible to view and
download by anyone on the internet with the corresponding Loom

weblink until *at least* January 12, 2024. Recoop downloaded a copy of the Loom screen recording described in Mr. Freed's Recoop Lawsuit Affidavit as an MP4 video file on January 12, 2024, via the corresponding Loom weblink. Attachment M – Loom Video Download.

Several screen-captures of the "Loom Video" are now a matter of public record in the Recoop Lawsuit.

Mr. Freed retained a copy of the "Loom Video" in the danfreed1@gmail.com Loom account. The "Loom Video" has been a topic of litigation in the Recoop Lawsuit and Mr. Freed describes the "Loom Video" in his Recoop Lawsuit Affidavit. The "Loom Video" was also reviewed by a digital forensic expert, Stroz Friedberg, and the litigation counsel for Mr. Freed and Thesis in the Recoop Lawsuit, Lauren Davis and Steven Kayman of Rottenberg Lipman Rich P.C, before Thesis filed motions in the Recoop Lawsuit in December 2024.

Significance of the "Loom Video" in *LeDoux v. Outliers, Inc. dba Thesis et al.* -

The "Loom Video" confirms how a Formula customer would have experienced the "FindMyFormula" e-commerce website's checkout page at least as early as January 22, 2020. Mr. Freed has been aware of the contents of the "Loom Video" in the context of the Recoop Lawsuit since at least the time Mr. Freed provided a downloaded copy of the "Loom Video" to the digital forensic

expert, Stroz Friedberg, in September 2024, according to the publicly available document Exhibit 4 to ECF No. 96 in the Recoop Lawsuit. Mr. Freed later signed his declaration that discussed the "Loom Video" on December 13, 2024, according to the publicly available document Exhibit 13 to ECF No. 96 in the Recoop Lawsuit. I am aware from the publicly available document ECF No. 15 in the LeDoux litigation that Mr. Freed signed a declaration dated November 13, 2024, regarding Outliers first Motion to Compel Arbitration, in which he claimed that the Formula website checkout page in 2021 contained conspicuous, hyperlinked Terms and Conditions and a required checkbox to purchase a Formula product.

At timestamp 26:22 of the "Loom Video," Mr. Freed shows the existing user-facing CartHook Checkout page for FindMyFormula for January 22, 2020. Attachment N – CartHook Checkout Page. On that checkout page, there is no required checkbox, and there are no hyperlinks for "terms and conditions" or "medical waiver." At timestamp 26:25 of the Loom Video, it is visible from the company logo and website URL that this is the Formula website Checkout page. Attachment O.

At timestamp 52:15 of the "Loom Video," Mr. Freed is logged into the Recoop-owned Google account and email address biz@getrecoop.com, where Mr. Freed has been continuously logged in since timestamp 8:57 of the Loom Video performing work for

Recoop, when Mr. Freed then begins to navigate in his browser to the web link for the "Standup Document."

I am aware that the LeDoux litigation made the Formula website CartHook checkout page relevant. That Formula website checkout page is demonstrated in the "Loom Video" and when looking at the "Loom Video," had it been disclosed to LeDoux's attorneys, the weblink to the "Standup Document" would also have been plainly visible. From the "Standup Document," the "Loom Video" link is active to view and download as of April 26, 2025, and would have provided the website checkout and additional substantive evidence in their case.

I declare under penalty of perjury that the foregoing is true and correct.

_a alt_
_____
Anastasia Alt on behalf of Recoop LLC

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RECOOP LLC,<br><br>                Plaintiff,<br><br>    - against -<br><br>OUTLIERS INC. d/b/a THESIS<br>NOOTROPICS INC.,<br><br>                Defendant. | Civil Action No.: 1:24-cv-01810-LJL<br><br>**DECLARATION OF DANIEL FREED IN**<br>**SUPPORT OF DEFENDANT THESIS'**<br>**MOTION FOR SUMMARY JUDGMENT** |
| OUTLIERS INC. d/b/a THESIS<br>NOOTROPICS INC. and DANIEL<br>FREED,<br><br>                Counterclaim and<br>                Third Party<br>                Plaintiffs,<br><br>    - against -<br><br>RECOOP LLC and ANASTASIA ALT,<br><br>                Counterclaim and<br>                Third Party<br>                Defendants. | |

I, Daniel Freed, declare under penalty of perjury that the following facts are true and correct:

1.      I am the Chief Executive Officer of Defendant/Counterclaim Plaintiff Outliers Inc. d/b/a Thesis Nootropics Inc. ("Thesis") and I am a Third Party Plaintiff in this case, and as such, am fully familiar with the facts relevant hereto.

2.    I respectfully submit this declaration in support of Thesis' motion for summary judgment to dismiss the First Amended Complaint (the "Complaint") filed by Plaintiff/Counterclaim Defendant Recoop LLC ("Recoop") in its entirety with prejudice.

3.    The investigative report of digital forensic expert Stroz Friedberg, LLC ("Stroz Friedberg") confirms that I did not, whether on my own behalf or on behalf of Thesis, engage in any of the unlawful conduct alleged in this action. Any actions that I took while I was a member and employee of Recoop were for the benefit of Recoop. In particular, I did not at any time access Recoop's computer systems for an improper purpose, misappropriate Recoop's proprietary information or use or permit the use of any such information by Thesis.

4.    There is ample documentary evidence submitted in support of this motion and digital evidence directly examined by Stroz Friedberg during its forensic investigation (see the screenshots in the appendices of the investigative report) showing that any work I performed in relation to marketing pixels was for the benefit of Recoop and further that the three pixels referenced in Recoop's Complaint did not transmit the information alleged by Recoop to have been transmitted to Thesis or me; nor did Thesis or I use or disclose any such Recoop information.

5.    Put simply, digital evidence and documents demonstrate that I did not do what Recoop is alleging.

A.    **Background as to My and Alt's Involvement with Recoop and Thesis.**

6.    On or about July 18, 2018, Third Party Defendant Anastasia Alt and I co-founded Recoop, a direct-to-consumer ecommerce company that sells vitamin supplements primarily directed at consumers who take stimulants.

7.    From Recoop's founding to the present day, Alt was and is the CEO of Recoop and is and was the managing member of Recoop.

8.      Alt has a demonstrated track record of using the legal process against her collaborators.

9.      For example, during her tenure as Recoop's CEO, Alt has asserted legal claims against at least one other Recoop member other than me, including filing a July 5, 2022 lawsuit against Karalyn Zamora, a former member of Recoop and co-founder of Alt's other health and wellness company, Yana Sleep LLC, in the Superior Court of the State of California for the County of Los Angeles under Case No. 22SMCV01066, asserting substantially similar claims of unfair competition and bad faith misappropriation of information as asserted by Recoop against Thesis in the instant action. (Ex. K).

10.      From Recoop's founding to February 28, 2020, when I was terminated by Alt, I was a co-founder, member, officer and employee of Recoop, and worked under Alt's supervision.

11.      Approximately a year and a half prior to Recoop's founding, on or about January 17, 2017, I co-founded Thesis, a direct-to-consumer ecommerce company that sells "nootropic" health supplements. From the founding of Thesis to the present day, I have been the CEO and a shareholder of Thesis.

12.      From on or about June 15, 2018 to March 8, 2021, Alt was a shareholder of Thesis and served as an advisor to Thesis and was privy to Thesis' internal systems and marketing strategy.

13.      At all relevant times herein, Alt had specific and direct knowledge that while I was a co-founder, member, officer and employee of Recoop, I was also a co-founder, shareholder, officer and employee of Thesis. Alt did not object to, and in fact expressly consented to, my simultaneous work for both companies, especially given her status as an investor in and advisor to Thesis where she directly interacted with me as Thesis' CEO.

**B.      Background Regarding My Work on Recoop's Website and Marketing Pixels.**

14.      During my affiliation with Recoop, under the supervision and direction of Alt, I worked on developing Recoop's website along with third party contractors hired by Recoop, including but not limited to Recoop's third party marketing agency, Constellation.

15.      It is my understanding that Recoop has said in sworn interrogatories (Ex. E at 8) that its claims in this lawsuit involve information that was allegedly transmitted through marketing pixels with the following three account identification ("ID") numbers:

       i.   Google Tag account: GTM MSJ7KHL;

      ii.   Google Analytics account: UA-57833108-2; and

     iii.   Facebook/Meta account: 1370548453107099.

**i.      Google Tag Account: GTM MSJ7KHL.**

16.      A Google Tag Manager ("GTM") is a free tag management system that allows users to manage and set up tags on their website or mobile app without changing the code of the website. A GTM can be used for a variety of purposes, including conversion tracking, site analytics, remarketing, and managing how tags behave after users make cookie consent decisions.

17.      Under the supervision and direction of Alt, I worked to troubleshoot issues related to the Google Tag's installation on Recoop's website with representatives of Google. For example, on or about January 17, 2020, Alt was still actively involved in supervising the project as she commented on Recoop's internal messaging platform, Trello, under the title of "Validate 10x Profitable Google Campaign" as follows: "Dan needs to talk to Google support about troubleshooting the problem; by next Thursday, both implementations for Google Merchant Center and Retargeting will be up and if Retargeting gets denied, then we'll have a new reason for that to workoff of." (Ex. D at THESIS 000270).

18.     This meeting with Google support is the Loom video that I screen-recorded to ensure that Recoop would have the information for installing or troubleshooting the pixels provided by Google support to me during this meeting.

19.     To comply with Alt's directive, I was provided with access to the Google Tag manager associated with the Google Tag account ID number of GTM MSJ7KHL by an employee and/or contractor of Constellation through my personal email address of "danfreed1@gmail.com," which is the email address I was using to perform work for Recoop when I was affiliated with it. (*See id.* at THESIS 000500).

20.     I did not even know that my account was still connected until Recoop filed this lawsuit and I began investigating Recoop's claims.

21.     At all times relevant herein, the Google Tag was and is not owned by Thesis, was not created by Thesis for any use by Thesis or for the benefit of Thesis, and did not transmit any Recoop information to Thesis.

22.     If any data was transmitted to me by the Google Tag, such data was stored in the Google Tag manager account and as mentioned above, I did not even know that I was not fully removed from access to the Google Tag manager until after this lawsuit was filed.

**ii.   Google Analytics Account: UA-57833108-2.**

23.     A Google Analytics ("GA") pixel is a piece of code that tracks user behavior and attributes on a website. It is a tiny image that is usually hidden and embedded in the header of each web page. The pixel is triggered each time a page is loaded and tracks how users navigate a website, the time they spend on a page, and how they interact with content. Essentially, GA can provide insights into a website's performance by tracking how visitors engage with it.

24.     To date, neither Thesis nor I have been able to find any record of the GA ID of UA-57833108-2 on our electronic systems.

25.     At all times relevant herein, I was not aware of GA ID of UA-57833108-2 until Recoop referenced it in this action. At no time did I use, access or disclose any of Recoop's information relating to or in connection with this ID number.

26.     To the extent that I worked on any tasks relating to GA while I was affiliated with Recoop, any such activities were performed for the benefit of Recoop and neither Thesis nor I created any GA account or pixels for use by Thesis to obtain Recoop's information nor did any GA pixels transmit Recoop's information to Thesis or me.

### iii. Facebook/Meta Account: 1370548453107099.

27.     A Facebook/Meta pixel is a piece of code that helps a website track and analyze how people interact with that website after seeing a Facebook ad linked to the website. It collects data that helps track conversions from Facebook ads, optimize ads, build targeted audiences for future ads and remarket to people who have already taken some kind of action on the website.

28.     As it relates to the Facebook/Meta account ID number of 1370548453107099, when Recoop initially made its allegations against Thesis and me and provided the Facebook/Meta ID through its prior counsel, Thesis preliminarily investigated and contacted Meta Platforms, Inc. ("Meta") to ascertain ownership of the Facebook/Meta pixel because neither Thesis nor I could find any record of the Facebook/Meta ID on either of our respective electronic systems.

29.     On March 15, 2024, a representative from Meta Platforms, Inc. confirmed in an email to a representative of Thesis that the Facebook/Meta ID number of 1370548453107099 is "tied to getrecoop.com," Recoop's website. (Ex. F).

30.     To date, other than the ID number appearing in relation to the preliminary investigation mentioned above, neither Thesis nor I have been able to find any record of the Facebook/Meta ID of 1370548453107099 on our electronic systems.

31.     To the extent that I worked on any tasks relating to Facebook/Meta while I was affiliated with Recoop, any such activities were performed for the benefit of Recoop and neither Thesis nor I created any Facebook/Meta account or pixels for use by Thesis to obtain Recoop's information nor did any Facebook/Meta pixels transmit Recoop's information to Thesis or me.

**C.     Background Regarding Autorize.Net Payment Processor Issue.**

32.     On or about January 6, 2019, as part of my website development responsibilities for Recoop, I sent Alt a WhatsApp message regarding issues with a credit card payment processor that Recoop was trying to use for the launch of its website. (Ex. D at THESIS 000502).

33.     Because Recoop mentioned prescription medications on its website, such as Adderall, Recoop's desired payment processor kept rejecting its use on Recoop's website due to strict regulations on the subject. In order to meet launch deadlines and test Recoop's website for purposes of how customers would make purchases, I inserted Thesis' Authorize.net account information on a temporary basis for testing purposes. (*See id.*). I noted that I had inserted Thesis' payment processor information (called "Formula" at the time) to Alt in the January 6, 2019 text message and informed her that it would need to be changed before ten charges occurred. (*Id.*).

34.     Alt thus had express written notice, and acknowledged such notice by responding to that text message on that same date, that I was installing Thesis' payment processor information in January 2019, over five years ago, for the sole purpose of testing and that it would need to be changed. (*See id.*).

35. Thesis' payment processor information was indeed promptly replaced by Recoop's newly created payment processor information once Recoop's website was approved by its payment processor.

36. Sometime later and after my termination and documented handover of matters pertaining to Recoop's website (Ex. D at THESIS 000178, THESIS 000216-000219, THESIS 000226-228), Recoop, apparently through its own negligence, somehow reactivated the prior code in Shopify containing Thesis' payment processor information.

37. Thesis obviously did not consent to such reactivation since I had expressly advised Alt that Thesis' payment processors could only be used for testing due to the extenuating circumstances at the time.

38. Most importantly, any alleged customer information implicated by Recoop's reactivation of Authorize.net due to Recoop's negligence was not related to Google or Facebook/Meta pixels.

39. This distinction is important because, prior to filing this action, Recoop initially asserted claims against Thesis and me, personally, solely in relation to Authorize.net. (Ex. G at RECOOP 012777-012778, RECOOP 005486-005489).

40. Alt even sent emails to several Thesis investors and prominent social media influencers wrongly accusing Thesis of stealing customer information through Authorize.net to poison Thesis' investment and marketing prospects. (*Id.* at Ex. G at RECOOP 012777-012778).

41. Recoop eventually changed course, however, and instead filed its complaint regarding never-before-mentioned allegations pertaining to Google and Meta/Facebook pixels (and not Authorize.net) because any alleged misconduct by me in relation to Authorize.net is

belied by my January 2019 text exchange with Alt and digital evidence of Recoop's own negligence in reactivating the code. (*See* Exs. A, D, E, G).

42.    Alt's change of extortion tactics from Authorize.net to the pixels is directly evidenced in her own emails, where she admits to third parties that she was looking for ways to go after (and thus extract money) from me or Thesis. (Ex. G).

**D.    Recoop Seeks to Evade Its Contractual Obligations Through the Deceptive Stratagem of Suing Only Thesis.**

43.    My last date of employment with Recoop and as an officer of Recoop was on or about February 28, 2020. (Ex. 2 of Ex. B).

44.    On or about February 29, 2020, Recoop and I executed the Separation Agreement. (Ex. 2 of Ex. B).

45.    The Separation Agreement contains, among other things, a general release of claims by Recoop against me in section 3(b). (Ex. 2, ¶ 3(b) of Ex. B; *see* Ex. B, ¶¶ 5, 9, 56-60).

46.    Emails, text messages, and Trello cards show that Alt, on behalf of Recoop, directed me to troubleshoot the Google Tag on Recoop's website well prior to February 28, 2020, making "any and all" existing or future claims against me pertaining to these activities subject to the release. (Ex. D; Ex. 2, ¶ 3(b) of Ex. B).

47.    As an officer and member of Recoop, I was also subject to the provisions of Recoop's Operating Agreement, dated February 27, 2019. (Ex. 1 of Ex. B).

48.    Section 12(a) of Recoop's Operating Agreement contains an indemnification and advancement provision. (Ex. 1, ¶ 12(a) of Ex. B).

49.    While Recoop has tried to make it seem like its claims in the complaint are against Thesis, its claims are really against me as a former Recoop member. (*Compare* Ex. A *with* Ex. D).

50.     Any actions that I took regarding Recoop's website and pixels while I was a member of Recoop were for the sole benefit of Recoop, and not Thesis or myself.

51.     Recoop originally asserted claims against me personally prior to the filing of its initial complaint but changed to only asserting claims against Thesis once I expressed to Alt that I believed I was entitled to indemnification and advancement under Recoop's Operating Agreement to defend against allegations involving work I performed while I was a member, officer and employee of Recoop. (*See* Ex. G).

52.     Recoop thus knowingly and deliberately omitted my affiliation with Recoop from its initial and amended complaints for the express purpose of avoiding its contractual obligations to me for indemnification and advancement under the Operating Agreement and release in my Separation Agreement. (*Compare* Ex. A *with* Ex. D; *see* Ex. G).

53.     Recoop's communications to third parties regarding its allegations about Thesis and me prior to Recoop filing this action, (*see* Ex. G), have significantly harmed my reputation and personal and professional relationships, as well as Thesis' business opportunities and partnerships, despite my efforts to mitigate damages to the relationships with Thesis' investors and marketing partners.

54.     I request that Thesis' good name, as well as my own, be cleared by dismissing the Complaint.

**WHEREFORE**, I respectfully ask this Court to enter an Order granting Thesis' motion for summary judgment to dismiss Recoop's Complaint in its entirety with prejudice and granting such other and further relief as is just and proper.

I verify under penalty of perjury that the foregoing is true and correct.

Dated: December 13, 2024
      New York, New York

*Dan Freed*
_____
DANIEL FREED

# EXHIBIT 3

# OUTLIERS INC.
# PURCHASE AGREEMENT

**THIS PURCHASE AGREEMENT**, (the "**Agreement**") is made as of March 9, 2021, by and between Anastasia Alt ("**Seller**") and Outliers, Inc., a Delaware corporation ("**Purchaser**" or "**Corporation**").

WHEREAS, Seller is the holder and owner of 39,370 of the issued shares of the Purchaser (the "**Shares**"), and

WHEREAS, the Seller desires to sell to the Purchaser, and the Purchaser desires to purchase from Seller, all of the Shares, and

WHEREAS, Seller's role as advisor, as set forth in that certain Outliers Advisor Agreement, by and between the Seller and the Company dated as of January 1, 2018, was terminated voluntarily on or about February 29, 2020, and the parties acknowledge and agree that at that time the parties expressly waive the fifteen (15) day termination notice period contained therein, and

WHEREAS, Purchaser has agreed to purchase and Seller has agreed to sell the Shares upon the terms, covenants and conditions hereinafter contained.

NOW, THEREFORE, for and in consideration of the mutual promises and conditions hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree and declare as follows:

## ARTICLE I
## ACQUISITION OF SHARES

1.01 <u>Transfer of Shares.</u>  Seller agrees to sell, convey, assign, transfer and deliver to Purchaser, and Purchaser agrees to purchase and acquire from Seller, the Shares.

1.02 <u>Purchase Price.</u>  The Purchase Price for the Subject Shares shall be nineteen thousand dollars ($19,000), as well as the other promises and conditions made by Purchaser in this Agreement. The cash consideration shall be paid by Purchaser to Seller by certified check or wire transfer to the account or accounts of Seller, as Seller shall instruct in writing. The Seller and Purchaser hereby acknowledge and agree that the Purchase Price has been determined between the parties for the purposes of this Agreement only, and does not constitute a valuation of the Corporation's common equity. Corporation agrees to remit the cash consideration to the Seller no later than seventy two (72) hours from the execution by both parties of this Agreement.

1.03 <u>Surrender of Simple Agreement For Future Equity</u>. In further consideration for the Purchase Price and the other rights and covenants contained herein, Seller shall surrender the Simple Agreement for Future Equity, dated January 10, 2018 (the

Doc ID: 3839ddeec5fd5e00c3b48c823bac29f0e8ce025c

"**SAFE**"), to the Corporation for cancellation.

1.04   <u>General Release</u>. Seller hereby agrees to remise, release and forever discharge the Corporation and its officers, directors, servants and agents (collectively, the "**Corporation Releasees**") from any and all actions, causes of action, suits, debts, dues, sums of money, claims, demands and obligations whatsoever, in law or in equity, and whether known or unknown, suspected or unsuspected, which the Seller has or may in the future have against the Corporation Releasees.

1.05   <u>Non-Disparagement and Confidentiality</u>.  Seller agrees not to disparage or make any negative or denigrating remarks about the Corporation Releasees, either orally or in writing.  The Seller further agrees not disclose the terms of this Agreement or any details regarding the events from which it arose, in oral or written form, to any person or entity.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF SELLER

2.01   <u>Representations and Warranties</u>.  Seller represents and warrants as follows to Purchaser:

A.  Seller is the holder and owner of record of the Shares being sold by Seller hereunder.

B.  All of the Shares of Seller are free and clear of all options, restrictions, liens, assessments, pledges, charges, claims and encumbrances of any nature of kind whatsoever, and are not subject to any restrictions with respect to transferability, other than those stated in this document.

C.  Seller has the full and absolute right, power, authority and capacity to enter into this Agreement and to transfer and convey to Purchaser the Shares being sold by Seller hereunder.

D.  Seller is unaware of any pending or threatened legal claims or causes of action against the Corporation in any Court in any jurisdiction including but not limited to any civil suit or claim and/or any tax liability or claim.

2.02   <u>Survival of Representations and Warranties</u>.  The representations and warranties made by Seller in this Article III shall survive and shall be enforceable after the execution and performance of the parties under this Agreement (the "**Closing**").

## ARTICLE IV
## MISCELLANEOUS

3.01   <u>Amendment, Law Governing</u>.  This Agreement may not be amended, modified or

changed, nor shall any waiver of any provision hereof be effective, except by an instrument in writing and signed by the party against whom enforcement of any waiver, amendment, change, modification or discharge is sought.  This Agreement was entered into in, and shall be construed and interpreted according to the laws of, the State of Delaware.

     3.02  <u>Binding on Successors and Assigns.</u>  The covenants, agreements, representations and warranties contained in this Agreement shall survive (and shall be enforceable after) the Closing and shall be binding upon, inure to the benefit of and be enforceable by, the parties hereto and their respective heirs, administrators, executors, successors and assigns.

     3.03  <u>Captions.</u>  The paragraph headings or captions appearing in this Agreement are for convenience of reference only, are not a part of this Agreement, and are not to be considered in interpreting this Agreement.

     3.04  <u>Independent Legal Representation</u>.  The Purchaser and the Seller are each independently represented by legal counsel of their choosing and have had a full and fair opportunity to consult with such counsel prior to entering into this Stock Purchase Agreement.

     3.05  <u>Severability</u>.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

[Remainder of the page left intentionally blank]

Doc ID: 3839ddeec5fd5e00c3b48c823bac29f0e8ce025c

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**SELLER:**                                    **PURCHASER: OUTLIERS INC.**

*Anastasia V. Alt*                         *Dan Freed*

Anastasia Alt                              By: Daniel Fried

Doc ID: 3839ddeec5fd5e00c3b48c823bac29f0e8ce025c

 **HELLOSIGN**

# Audit Trail

| | |
|---|---|
| **TITLE** | Formula Buyback Agreement - Anastasia Alt |
| **FILE NAME** | FORMULA - Purchas...Alt - 040921.docx |
| **DOCUMENT ID** | 3839ddeec5fd5e00c3b48c823bac29f0e8ce025c |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

## Document History

| | | |
|---|---|---|
| **SENT** | **04 / 10 / 2021**<br>03:46:54 UTC | Sent for signature to Anastasia Alt<br>(anastasia@getrecoop.com) from dan@placeboproof.com<br>IP: 71.105.143.44 |
| **VIEWED** | **04 / 10 / 2021**<br>19:14:09 UTC | Viewed by Anastasia Alt (anastasia@getrecoop.com)<br>IP: 172.58.23.64 |
| **SIGNED** | **04 / 10 / 2021**<br>19:15:08 UTC | Signed by Anastasia Alt (anastasia@getrecoop.com)<br>IP: 172.58.23.64 |
| **COMPLETED** | **04 / 10 / 2021**<br>19:15:08 UTC | The document has been completed. |

Powered by **HELLOSIGN**

 Standup                                    ✕

**Details**                    Activity

 | 

Private to you

Manage access

## File details

**Type**
Google Docs

**Size**
80 KB

**Storage used**
80 KB

**Owner**
Dan Freed

**Modified**
Aug 2, 2023 by Dan Freed

**Opened**
Mar 9, 2023 by me

**Created**
Feb 4, 2018

**Download permissions**
Viewers can download



## Standup

Details                    **Activity**

## Older

  Dan Freed shared an item
Aug 7, 2018, 7:24:22 PM



 **Anyone on the internet with the link**
Editor

  Dan Freed shared an item
Aug 7, 2018, 7:24:18 PM



 **Anyone on the internet with the link**
Viewer

# Set general access sharing options for your organization

Use target audiences to help users share appropriately

*This article is for administrators. To learn about managing access to your own files,* go here instead.

*Supported editions for this feature: Business Standard and Business Plus; Enterprise Standard and Enterprise Plus; Education Standard and Education Plus; G Suite Business; Nonprofits.* Compare your edition

As an administrator, you can control the general access options users have when they share a file in My Drive. By default, users have 2 general access options: **Restricted** or your entire organization. You can add other options by creating target audiences.

Target audiences are lists of groups and users, such as a department or team, that you set up. After you create target audiences, you can choose which is the primary target audience. The primary target audience is the one that's automatically suggested to users. Initially, the primary target audience is named *your organization* and includes all users in your organization.

## On this page

- Examples of general access setups
- How general access options apply
- Set up general access options
- Set the default general access for new items

## Examples of general access setups

- **Customize the primary target audience:** You can set which target audience is the primary target audience by group or organizational unit. For example, if you have a Marketing organizational unit, you can create a "Marketing" target audience and set it as the primary target audience for that organizational unit. That way, when a user in the Marketing organizational unit goes to allow general access, the first option they have is "Marketing".
- **Limit general access options:** You can add and remove target audiences in users' general access sharing options. For example, you might allow users to give general access to only their department and remove the option for the entire organization.

## How general access options apply

- Shared drives get the general access options that you set for the organizational unit the shared drive is assigned to.
- If you remove a target audience from sharing settings, *files remain shared with that target audience*, even though that target audience is no longer in the general sharing options. To block further access, either remove members from the audience or delete the audience from the list of target audiences in the Directory.
- If your organization has Cloud Identity and Google Workspace licenses, the general access options apply to Cloud Identity users.

## Set up general access options

**Before you begin:** If needed, learn how to apply the setting to a department or group   .

1. Sign in   with an *administrator* account to the Google Admin console.

   If you aren't using an administrator account, you can't access the Admin console.

2. Go to Menu ☰ › ⠿ **Apps > Google Workspace > Drive and Docs** .

   Requires having the Service Settings administrator privilege .

3. Click **Sharing settings > Target audiences.**
   The **Audiences** list shows any target audiences that are already applied to the service, in the order they're listed in users' sharing settings.

4. (Optional) To apply the setting only to some users, at the side, select an **organizational unit** (often used for departments) or configuration **group** (advanced). Show me how 👓
   Group settings override organizational units. Learn more

5. Click **Add Target Audience.**

6. Check the box next to the target audience that you want to add. If the only target audience is the top organizational unit, click **Create Target Audience.** For details on setting up target audiences, see About target audiences.

7. Click **Save.**

8. Point to the target audience you want to be the primary target audience and change it to position 1 by dragging or changing the number.

9. (Optional) Put the other target audiences in the order you want. To remove a target audience, click Remove item ✕.

10. Click **Save.** Or, you might click **Override** for an organizational unit 👓.
    To later restore the inherited value, click **Inherit** (or **Unset** for a group).

It can take up to 24 hours to see changes. During this time, old and new settings might be intermittently enforced.

## Set the default general access for new items

By default, general access is set to **Restricted.** This is the recommended setting for most users, so they can share a file only when they're ready and keep personal files private.

**Before you begin:** If needed, learn how to apply the setting to a department or group .

1. Sign in with an *administrator* account to the Google Admin console.
   If you aren't using an administrator account, you can't access the Admin console.

2. Go to Menu ☰ › ⠿ **Apps > Google Workspace > Drive and Docs** .
   Requires having the Service Settings administrator privilege .

3. Click **Sharing settings > General access default.**

4. (Optional) To apply the setting only to some users, at the side, select an **organizational unit** (often used for departments) or configuration **group** (advanced). Show me how 👓
   Group settings override organizational units. Learn more

5. Choose an option:
   a. **Private to the owner**—Only the file owner can access new files.
   b. **Anyone in** *your organization* **can access the item if they have the link** (for organizations without target audiences)—Files with this setting aren't included in search results unless there are links to them from other files that are searchable.
   c. **Anyone in** *your organization* **can search and find the item** (for organizations without target audiences)—Files with this setting are listed in a user's Drive only after they access the file or the file is shared with them.
   d. **The primary target audience can access the item if they have the link** (for organizations with target audiences)—Files with this setting aren't included in search results unless there are links to them from other files that are searchable.

Case 1:25-mc-00298-DEH    Document 12-13    Filed 07/24/25    Page 39 of 69

e. **The primary target audience can search and find the item** (for organizations with target audiences)—File with this setting are listed in a user's Drive only after they access the file or the file is shared with them.

6. Click **Save.** Or, you might click **Override** for an **organizational unit** .

   To later restore the inherited value, click **Inherit** (or **Unset** for a group).

It can take up to 24 hours to see changes. During this time, old and new settings might be intermittently enforced.

---

---

### Need more help?
Try these next steps:



**Post to the help community**
Get answers from community members

**Contact us**
Tell us more and we'll help you get there

**\*Standup .docx**    656 KB

Modified: Thursday, December 14, 2023 at 9:49 AM

Add Tags…

˅ General:

Kind: Microsoft Word Document
Size: 656,273 bytes (659 KB on disk)
Where: Macintosh HD ▸ Users ▸ home ▸ Dropbox (Personal) ▸ Thesis-Recoop_Dispute-Documents ▸ \*The 'Standup' Google Document

Created: Thursday, December 14, 2023 at 9:49 AM
Modified: Thursday, December 14, 2023 at 9:49 AM



## Transcript: Loom Video

**DAN:** Hello?

**GOOGLE REP:** Hi, Dan. Gagan here from the Google implementation team.

**DAN:** Hi. How are you?

**GOOGLE REP:** Well, I'm good, Dan. How are you?

**DAN:** Good.

**GOOGLE REP:** All right. So, I just want to keep you posted that this is a recorded call for quality assurance and training purposes. And this was a request sent out by Dora, who's in Google account status', to have you set up as the marketing and as conversion tracking on get.myrecoop.com. You responded to the authorization email, which basically states that for us, we have you with the ads set up today. You should have the access to your ads account and also the access to the back end of the website. All right?

**DAN:** Yep.

**GOOGLE REP:** Do you also have a backup of your website?

**DAN:** Yep.

**GOOGLE REP:** That's perfect. I hope you read the terms listed out on the authorization email before you responded to it. The terms.

**DAN:** They're all Ok with me. Google has been great. I'm excited to get this done and to start scaling up our ad spend.

**GOOGLE REP:** Thank you. Thank you. So, let's get started then. There's an option for you to present your screen at the bottom towards the right of the screen share. Share with me please. If you could just share your screen. I would want to have a look at your account and then we can get started.

**DAN:** OK. So just to give you an idea of what we're going to be doing.

**GOOGLE REP:** Yeah.

**DAN:** Basically, we have a lot of compliance issues that Dora is helping us with. So, we have a main website and then we have a Google website. The Google website is compliant for all the terms, the language we use, we had to configure a lot of things to meet with all of the policies. Does that make sense?

**GOOGLE REP:** Oh, yes. Yes.

**DAN:** So, in order to do retargeting on the visitors to our main site, to the Google site, we need to set up a more complex system so that we're compliant with all of Google's policies, yet we can still retarget visitors to our main site. Does that make sense?

**GOOGLE REP:** Oh, yes. Absolutely.

**DAN:** So, for this, there's two places where we're going to be working. Currently, the Google site is on Unbounce, and we have specific landing pages, product pages, just for Google and then our main site is Shopify. So, we want to create all the audiences on

our Shopify site and then also tag everything in our Unbounce site so that we can do retargeting. One is pushing the retargeting to the Unbounce site, and the other is retargeting the actual Unbounce visitors which come from our Google campaigns.

**GOOGLE REP:** Ok. All right. So, a question here.

**DAN:** Yeah.

**GOOGLE REP:** Now, you have your ad campaign signing, so are the campaigns going to be diverting us directly to the Google site but on Unbounce?

**DAN:** Yeah, everything.  So currently

**GOOGLE REP:** [Inaudible 3:32]

No, right now, everything's going to be going to Unbounce, but as we scale up. Unbounce has a couple things where it's a little bit slow, you can't build out a full website. So, in the next two weeks, we're going to completely build the Shopify store that is just for Google that doesn't touch our main store URL. And so, we'll be having to do the same thing on Shopify in like two weeks. If you could kind of show me how to do it. If it's just copying and pasting the same code, I could do it. Otherwise, we'll set up a call in two weeks.

**GOOGLE REP:** Perfect. Yes. So, it's just one piece of code, the global site tag which has to be implemented in the head section of the site. That's that it reflects on all the pages of it. It's pretty straightforward. I'll show you how we can have that set up.

**DAN:** Perfect. Yeah, but for your question, all traffic is going to be going to the Google compliance site from the Google campaigns, but some of the audiences are going to be built off our other site.

**GOOGLE REP:** Ok. All right. Perfect. So, all we'll have to do is implement the global site tag on the head section of the site that we're going to be working on today. The global, sorry the Google site.  And besides this, there was another tag -- tag that came in as a request, which is ad conversion tracking. So, can you give me a background on that? What exactly do you want to have track as a conversion to call to action?

**DAN:** So, I believe conversion tracking is set up. There was something where, because we had some ROAS campaigns where it wasn't properly recording revenue. Our revenue is actually booked through Recharge. Yeah. I -- the basic conversion is just a sale. That is working properly. What would be, so we only sell one product right now, but we're adding to the product line. So, it would be helpful if you could, and the one product we have is they can purchase a one-time order or a subscription. It would be helpful if we could tag those so that we could record, you know, how many subscriptions did we get? How many one-time orders and what was the conversion value for each? It's less important, but if that's an easy thing to do without like messing things up, I would be willing to do that.

**GOOGLE REP:** Ok, that's perfect. Yes. Yes, we can do that. We can have a look at it while we are working on this. So, for now, if you could just take me to the site that we're working on on a new app, I would want to have a look at the home page first.

**DAN:** Can you still see my screen?

**GOOGLE REP:** Yes, I can see your screen.

**DAN:** Ok. So, this, you just want to see the actual site, or you want to see the back end?

**GOOGLE REP:** The actual site actually also.

**DAN:** This is the site and then the Unbounce. Unbounce I think is...

**GOOGLE REP:** Oh, correct me if I'm wrong, but the Unbounce site is basically like the Google site that we're working on?

**DAN:** Yeah, yeah.

**GOOGLE REP:** Ok.

**DAN:** That's good. So, this is our main site.

**GOOGLE REP:** Ok. And today we're primarily working on the Unbounce site, which is get.myrecoop.com. Is that correct?

**DAN:** Well, so the Unbounce site has no tracking at all set up. So, we need to get that set up and we need to be able to build audiences off of that. But we also need to have this site, the main site is where all the conversions happen. And it's where we want to build the audience off of this site for retargeting.

**GOOGLE REP:** Ok. Ok. So, then I suggest that we have the global site that for remarketing implemented on both the websites. If that's the case.

**DAN:** Ok. Let me log into Unbounce.

**GOOGLE REP:** Sure.

**DAN:** Sorry, the other...

**GOOGLE REP:** So, you have a backup of both websites, right? Both on Unbounce and Shopify?

**DAN:** Yeah, Shopify is easy. We always make a clone of our site with the latest build and Unbounce. It's really easy. I don't know why my dash lane isn't working. It should be... Hold on one second.

**GOOGLE REP:** Sure.

**DAN:** Sorry about that. Are you still there?

**GOOGLE REP:** Oh, yes. Yes.

**DAN:** Ok. So, I can show you.

**GOOGLE REP:** I can still hear you.

**DAN:** Yeah. Can you see my screen?

**GOOGLE REP:** Oh, yes. Yes, I can.

**DAN:** So, this is all of the different Unbounce builds. This is our main Google. And then we're going to have a product page. So, we're going to have a couple of different pages that we're adding to this to do remarketing campaigns. But it is get -- We're set up a

whole domain just for Google. So, my recoup is our Google domain. And right now, everything's on Unbounce. But in the next two weeks, we're going to have to set up everything on Shopify and we'll build out a full site. And this is fully Google compliant.

**GOOGLE REP:** Ok. Ok. Understood. That's perfect. All right, So let's first have the code implemented here, on Unbounce. I think there's a place where you implement... I think you already have Google Analytics code. Can you show me exactly how that was implemented on the Unbounce website? Settings, I think.

**DAN:** Yeah. So, there's Script Manager.

**GOOGLE REP:** Ok.

**DAN:** Google Analytics four months ago. And I just put this... I did a very simple implementation. Yeah.

**GOOGLE REP:** Ok. That looks fine. All right. So please take me to your Google Ads account first. Let's have a look at your Google Ads account. This setup will take about 30 minutes.

**DAN:** That's fine.

**GOOGLE REP:** Just keep me posted.

**DAN:** Yeah.

**GOOGLE REP:** Yeah.

**DAN:** Ok.

**GOOGLE REP:** Can you click the user icon on the top right edge please? Please read out the customer ID that we're working on just for the record.

**DAN:** 9621857298.

**GOOGLE REP:** Thanks. Let's click tools and settings on the top right hand side. Shared Library, the second option there.

**DAN:** Yeah.

**GOOGLE REP:** And then audience manager. Let's click audience manager. Ok. Click audience sources. The third option towards the top left hand side. Audience sources.

**DAN:** Yeah.

**GOOGLE REP:** That was the one. Ok. Select the three dots on the top right edge of the Google Ads tag box. See the three dots there. Edit source. Ok. Scroll down please. Ok. Click save and continue. Click install the tag yourself, the first option. And you see the global site tag there. So, scroll down and then copy the code that you see there. The global site tag. And let's go to Unbounce. Let's go to script manager please, towards the left.

**DAN:** So, this is scripts manager. This is where you can either do this or you can embed code.

**GOOGLE REP:** Ok.

**DAN:** So, you can know that's embed code. I know there's a place where you can insert your ad script. So, you just go ad a script. And then you could do Google tag manager custom scripts.

**GOOGLE REP:** Let's click custom script please.

**DAN:** What's this one? Google remarketing.

**GOOGLE REP:** Yes, Google remarketing. Ok. Placement would be before. Can you click the top down there? I just want to see what the option there would be. Can you please click head? First option.

**DAN:** Included on all right.

**GOOGLE REP:** That's right. That's correct. All. And then place the code in the box there please. Ok. Save and publish script. The bottom righthand side. Ok. Is there a way to publish this? I think the changes should be saved otherwise. I am sure there is way to publish a website on Unbounce once you write in the script.

**DAN:** I believe that scripts like this are automatically, I just have to select it. You haven't selected any domains.

**GOOGLE REP:** Ok, let me check. [Inaudible 14:18]

**DAN:** I think I don't know how to select it for enable it on enabled. I have to put it on one domain. I don't know how to do that.

**GOOGLE REP:** Ok.

**DAN:** Domain. This is going to be at…get my recoup.

**GOOGLE REP:** Yeah.

**DAN:** So, wait. Google remarketing. I'm just going to check this. Save changes.

**GOOGLE REP:** Now it's going to show. Yeah. Now it's definitely going to be show.

**DAN:** Yeah. It's being published.

**GOOGLE REP:** Mm-hmm

**DAN:** Sorry. I'm not an engineer.

**GOOGLE REP:** That's ok. That's ok. No problem. Ok. This looks perfect. The remarketing tag is now live on the site. That looks fine. So, I suggest we have the same code implemented on your Shopify website or the main website because you will still be retagging that?

**DAN:** Yeah. So, go into Shopify here?

**GOOGLE REP:** Yeah. What's the name of this domain here? If you could just take me to the front end of this particular…

**DAN:** Right here, getrecoup.com.

**GOOGLE REP:** Getrecoup.com. Let me check. I'm sure that code is already implemented on Getrecoup but let me just double check. There's no remarketing tag there. That's OK. Let's go to Shopify.

**DAN:** Yeah.

**GOOGLE REP:** Ok. So, what's the left? Let's click online store. Click themes.

**DAN:** Yeah.

**GOOGLE REP:** Click the top down there, actions. And then click-- duplicate, please.

**DAN:** We can work with the live theme. We have backups.

**GOOGLE REP:** Oh, ok. ok, that's perfect. Then let's go to edit code, please. Let's go to team.liquid towards the left. Ok. And just do a control F and look for /head. Control F /head. Take me to the end of line 95.

**DAN:** Here?

**GOOGLE REP:** Nine. Yeah. Hit it. Click enter twice and then paste the code there, please.

**DAN:** Above the head code, like that?

**GOOGLE REP:** That's correct. Yes. That looks fine. Save changes on the top right-hand side. OK. Yeah, this code is also live now. So, we have remarketing on board get.myrecoop.com and getrecoop.com.

**DAN:** OK. For the remarketing, our checkout is on-- we have most of our checkout on Recharge and then we have some of our checkout on CartHook.

**GOOGLE REP:** Ok.

**DAN:** So, if you look here, if you hit buy now, this is Recharge. It goes to a different domain, and we need to take out customers from the retargeting audience. I don't know if I need a different code for this page specifically. And then we also have CartHook, which is a separate setup. I might need to paste the code in there. We're still setting it up for Google compliant campaigns.

**GOOGLE REP:** Ok.

**DAN:** But we might need to set it up there.

**GOOGLE REP:** OK. Just bear me for three minutes. I'll place this call on hold. Let me have a look at the website and be right back.

**DAN:** Sure.

**GOOGLE REP:** Thank you.

> ON HOLD, MUSIC PLAYING 19:00 – 21:46
>
> Dan messages Tanya Lyn on Recoop direct messaging, rescheduling a call regarding Gorgias. He moves over to "tryrecoop.gorgias.io" tab that is open on his web browser. He checks a chat with Ty Morton, then checks "My tickets", scrolls through "open", scrolls "FB-Recoop and opens a message from Marie Breyfogle, go back out and closes all tickets]

**GOOGLE  REP:** Thanks so much for that. Dan?

**DAN:** Yeah.

**GOOGLE REP:** All right. So, it looks like we'll have to implement the Global Site Act even on the Recharge app. Additional click box in the Recharge app, there. So, let's go to Shopify. And let's go to apps and look for a Recharge please.

**DAN:** Yeah. I know how to do it.

**GOOGLE REP:** OK.

**DAN:** Sorry, Recharge always takes forever to load.

**GOOGLE REP:** That's OK. Take your time please. There is an additional script box that all you have to do is paste the code there and what was the other checkout which you mentioned before on Shopify?

**DAN:** CartHook. So…

**GOOGLE REP:** Is that also an app on Shopify?

**DAN:** Yes.

**GOOGLE REP:** Ok.

**DAN:** It's for doing Google compliant checkout. We might have to-- We're still going to use the same Shopify back end to process the orders. But CartHook allows you to have a different URL from your Shopify store. So, the second-- the Google compliant site will live on Unbounce and have CartHook as the checkout, but Shopify as the back end. And I can show you-- it's a really simple implementation. You can just copy and paste the code.

**GOOGLE REP:** OK. I understood. Understood.

**DAN:** So, for here—

**GOOGLE REP:** It's in the app, right?

**DAN:** Yeah. I'll show you how. It should be simple. Where do I go in Recharge? Check out, I think.

**GOOGLE REP:** I think its towards the top.

**DAN:** This is-- this is where you have all the pixels.

**GOOGLE REP:** OK. OK. This is the one.

**DAN:** Yeah. This is the thank you page. I don't know if they have it on checkout.

**GOOGLE REP:** No, they usually wouldn't have any codes implemented on the checkout page.

**DAN:** Just the thank you.

**GOOGLE REP:** But then it definitely should be just the thank you page. That's right.

**DAN:** OK.

**GOOGLE REP:** So, ad this code below the existing code on this additional script box here, I don't think it's the same but let me check. Oh, it is the same. It is the same. Just try and scroll up.

**DAN:** Put that there.

**GOOGLE REP:** OK. Yeah, that was already there.

**DAN:** Ah, global site tag, Google ads. So, I can take it off.

**GOOGLE REP:** Yeah, you can take it off. There's no need for an additional code there. That's fine.

**DAN:** OK. So, this is done, right?

**GOOGLE REP:** Yep, that's done.

**DAN:** And then let me-- OK, so we don't have-- we don't have it set up yet, but I'm going to show you what CartHook looks like, and you can just tell me where to drop this code in.

**GOOGLE REP:** Ok.

**DAN:** Actually, I-- Google compliance is such a pain in the ass, I can't even tell you. But you guys make us so much money that we're willing to build an entirely different website just so we can do it. So basically, where it works is its product funnels. So let me go in here. Product funnels. So, this is a checkout funnel that sits on top of Shopify and allows me to basically do anything that I want on top of Shopify. So, I can have a custom URL that is just a checkout link and hook it up to any Shopify account. I have a checkout page, and I can edit the page. I can do custom CSS. And then on top of it, I can set up any pixels. I can set up the thank you page. But this is all going to be Google compliant. We haven't completed it yet. But it's just a software that sits on top of Shopify so that we don't have to use the main site URL on the Google compliant pages. So, I can go-- I think settings. I have tracking pixel, Google ID. These are all different keys from integrations. Or I could do-- I believe I can do a global site thing, not just on this funnel.

**GOOGLE REP:** Ok.

**DAN:** Do you have any idea where I would-- Uh-huh. It's not on.

**GOOGLE REP:** I think--I saw an option called settings. Can you please click settings?

**DAN:** Yeah, hold on.

**GOOGLE REP:** Ok.

**DAN:** Why is that? OK. So, this is the product funnels that we're going to be using. How-- I can do-- I believe there's got to be a global tag, or I can go into it.

**GOOGLE REP:** Ok.

**DAN:** So, settings here. This is tracking.

**GOOGLE REP:** OK. OK. Do you, by any chance, see the remarketing integration tag?

**DAN:** No.

**GOOGLE REP:** In case we can just base the ID.

**DAN:** No. It just says analytics.

**GOOGLE REP:** OK. OK.

**DAN:** But there should be a global setting. So, there's—no, that's analytics.

**GOOGLE REP:** Analytics.

**DAN:** There's got to be a global options (whispered).

**GOOGLE REP:** Usually what we-- usually we see a custom HTML box where you can implement a code right below a Google Analytics integration which was in settings.

**DAN:** So, the other thing that we—

**GOOGLE REP:** Where else can you start?

**DAN:** Inherent settings, no less shipping. I know that if you actually click into these, you can drop in any code that you want. So, in here—

**GOOGLE REP:** Towards the left you would see-- Yeah, I think I -- Yeah, the third option--there. OK.

**DAN:** So, I would have to copy and paste—

**GOOGLE REP:** Give me a minute. Please just give me a minute here. Let me see if that's the option. Just bear with me for a minute.

**DAN:** Yeah.

**GOOGLE REP:** OK. Can you remove from subscript? It has to go on the template HTML box.

**DAN:** Yep.

**GOOGLE REP:** Scroll down. Keep scrolling down.

**DAN:** That's as far as it goes.

**GOOGLE REP:** Just give me a minute.

**DAN:** Yep.

**GOOGLE REP:** It looks like I'm going--It looks like I'll have to customize the code here because we have still injected in script and not template to html. So, I'll share the code with you in just a few minutes. I'll place you on hold until then.

**DAN:** Yeah, no problem.

**GOOGLE REP:** Thank you.

ON HOLD, MUSIC PLAYING 30:45 – 32:45

Dan moves over to open tab "Recoop"; checks and replies to message from Tanya Lyn regarding rescheduling of call. Receives and opens email from Gagan with a link to a code.

**GOOGLE REP:** Thank you, Dan. I've sent you a code. Yeah, this is the one. Let's paste this code in the script section, please. Ok, let me check the code. Ok, that looks fine. Apply code changes. This is in the global section, right?

**DAN:** No. I can publish. You want to check it?

**GOOGLE REP:** Sure. Let's check. We can use tag assistant to have a look at it, which you already have installed on the website.

**DAN:** Publish. Let me see. I believe it published. Let me see. Save page. Publish. Publish page. This is preview. I'm going to go to the actual one.

**GOOGLE REP:** Ok.

**DAN:** How would I see?

**GOOGLE REP:** Just click tag assistant. You'll see a remark thing, or tag there.

**DAN:** So that's correct, right? The top one?

**GOOGLE REP:** Yeah, that's correct.

**DAN:** Ok.

**GOOGLE REP:** That's right. That's right.

**DAN:** Ok. And I have to do that for every funnel because there's not a global one.

**GOOGLE REP:** That's correct. You can use the same code there, which I sent across to you.

**DAN:** Ok. Thank you so much. What else do we have to do?

**GOOGLE REP:** All right. Add conversion tracking is what the other request was.

**DAN:** Yeah.

**GOOGLE REP:** Would you be interested in that?

**DAN:** Yeah, let's go for it.

**GOOGLE REP:** So, what code do I actually want to track here?

**DAN:** So, we, I -- because conversion tracking is working. We just don't have it set up properly to capture how much money each conversion is and to separate subscriptions from one time order and have the –the conversion value for the ROAS calculation isn't properly working. I don't know exactly what the problem is, but we look at the number of conversions and the value and it's not tracking properly.

**GOOGLE REP:** Ok. So, was it done for, on which website is this deployed on Shopify?

**DAN:** Shopify and Recharge.

**GOOGLE REP:** Shopify and Recharge.

**DAN:** Yeah. So, the conversions are working, and I can take you to the account. By the way, Dora is going to help with the remarketing thing, but this is building an audience now, right? So now, now that everything's properly installed, I should be getting, where would it be here?  Just so that I know.

**GOOGLE REP:** Yeah. Yeah. Tools and Settings from the top right hand side, and then audience manager under the shared library. A shared library please, a second options and then audience manager. So, you got your all visitors listed at Google Ads. That's the one that's going to start populating soon. It will include both the domains with that.

**DAN:** Ok. And then the all-converters is everybody that purchased on Recharge, right?

**GOOGLE REP:** Correct.

**DAN:** Ok. And we can, we can start building remarketing, and then even Google analytics. This already has 38,000. So, couldn't we just use this one too?

**GOOGLE REP:** That's right. You could. You could. When you're creating your campaigns, you can link your campaigns to any of the, you know, lists that you want.

**DAN:** Ok. Perfect.

**GOOGLE REP:** So, question here now, the conversion back in pixel, I know that you use Recharge. I don't know, is that the only checkout flow that you have on Shopify?

**DAN:** Yes. Right now, I'll go through that. But in the future, the very near future, they're going to start going through CartHook to Google compliance.

**GOOGLE REP:** Got it. So yeah, I think you're missing out on a dynamic variable for Recharge, which is not giving you the transaction details, although it's giving you the number of conversions or basically the leads who want products to add like so. Let me have a look at the website again. I'll just place you on hold for five minutes.

**DAN:** Sure.

**GOOGLE REP:** Thank you.

 ON HOLD, MUSIC PLAYING 38:12 –39:48

 Clicks over to iMessage from Carolyn Zebra Hou

**GOOGLE REP:** Thanks, Dan. So, we don't have a dynamic variable for it. We'll have to, you know, configure it. Taking the variables from the auto confirmation page itself. Would it be possible for you to place that order just so I can take a look at the auto-confirmation page?

**DAN:** Yeah, of course. Yeah.

**GOOGLE REP:** Ok. Yeah. So, can you take me to the auto-confirmation page, and then I'll tell you what else has to be done next after that.

**DAN:** OK.

**GOOGLE REP:** Just please stay there for a few minutes. I'll try and write a code for you. Five minutes, please. Thank you.

**DAN:** Yep.

 No dialog 41:09-42:44

  Dan checks iMessages from Carolyn Zebra Hou regarding their dog; Dan receives a phone call:

**DAN:** Hi, this is Dan.

**GOOGLE REP:** Hi, Dan. Can you hear me?

**DAN:** What's your last name? Can you spell it for me? Ok. You didn't get a confirmation email at all? That's very strange. We usually send a confirmation email. I can check. Can I call you back at this number? I can call you back in like 10 minutes. Ok. I'm going to check and see if any orders came through for you. And if they didn't, I can easily get you to the page so you can place an order. Ok. Bye. Hi. Sorry about that.

**GOOGLE REP:** That's ok.

**DAN:** Yeah.

**GOOGLE REP:** No Problem

**DAN:** I had a customer call.

**GOOGLE REP:** Can you just do a right-click on $86 there?

**DAN:** Yep. Do you want me to do inspect?

**GOOGLE REP:** Not yet. Just give me a minute, please.

**DAN:** Ok.

**GOOGLE REP:** Let's go back to the Recharge app where we saw the code implemented.

**DAN:** This is the thank you page.

**GOOGLE REP:** Ok. Got it. Please expand the box. I want to have a look at all the codes in the box there. Ok. Please go back to the auto confirmation page. Ok. Let's try to click 86 in green at the bottom and then inspect. Ok. Click the three dots on the top right edge of the box there, please. And then click anywhere outside of the box, please. Yeah. Click tag assistant now. Can you please share your entire screen then because you're just sharing a window. So, I'm not able to see the top down of tag assistant.

**DAN:** Yeah. Let me see. Can you see it now?

**GOOGLE REP:** Yes. Let's go back to the auto-confirmation page. Click tag assistant. Yeah. Click where to optimize and -- middle of the screen. Click the third option, Google Ads Conversion Tracking. Ok. Just give me a minute.

**DAN:** Yeah.

**GOOGLE REP:** It looks like your conversion is working here.  It's picking up the conversion value of 38 --$86.00.

**DAN:** How come it's not coming through on our analytics account? So, I can show you on our campaigns, if you go like this, this we have conversions, cost per conversions, value per conversion is $27.00. We don't have any product that's $27.00. Our cheapest product with a discount code would be more than 50.

**GOOGLE REP:** Yeah. What you'll have to look for is conversion value, the column right next to it. That's the purchase value.

**DAN:** What do you mean?

**GOOGLE REP:** Ok. So, let's go to tools and settings, please.  On the top right-hand side.

**DAN:** But isn't this value per conversion? We had 47 conversions and each one, the value was averaged at 27, right?.

**GOOGLE REP:** Can you hoover your curser over value per conversion. Just give me a minute.

**DAN:** It can't be less than $50.

**GOOGLE REP:** Ok. This is just approximately an average of each conversion. It's just an approximation. But try and hoover your curser over conversion value there. Let's see what that says.

**DAN:** The sum of all the conversions.

**GOOGLE REP:** Yeah.

**DAN:** But what I am saying is we don't have any products that are less than $50. So how is it possible? It has to be over reporting conversions then.

**GOOGLE REP:** Mm-hmm.

**DAN:** Or it's. Yeah. That's an even bigger problem. If it's over-reporting conversions, then we're really screwed. I thought it was just the value wasn't set up properly.

**GOOGLE REP:** There's one way to verify this. Let's go tools, and settings at the top right-hand side, and then convert -- shared library.  Sorry. Measurement, the third option. Conversions. Ok. So, the part is there is recording conversions. Can you slide over to the right? Is that a good number or conversion value?

**DAN:** Whoa. So, it's double reporting conversions.

**GOOGLE REP:** Ok.

**DAN:** Yeah. So, this one, the buy now button. I want to take this off. So, I'm going to pause it. I'm going to remove it, right?

**GOOGLE REP:** That's right. That's what's showing up in your conversion value.

**DAN:** Holy shit. That's really bad. That's so bad. Oh man. Ok. Well, that's definitely good to know.

**GOOGLE REP:** Is this fine though? For 40 in--purchases you got, that's the total transaction.

**DAN:** Yeah. I would look at that. I think that that's accurate.

**GOOGLE REP:** Yeah. Ok. Alright. So, I think your conversion is good to go here.

**DAN:** Ok.

**GOOGLE REP:** Yes, that you had to disable this.

**DAN:** Yeah. Ok. Yeah. That's all I needed. Thank you so much. I really appreciate everything.

**GOOGLE REP:** No problem. Just one last thing here. Can you please click purchase the third option there? So, the attribution model that your Google account status suggests is time decay, which it is. So yeah, that looks fine. Do you have any questions for the entire set-up that we have done today? Dan?

**DAN:** No, I think that's... Ok. Yeah. Yeah. No questions. Thank you so much for all your help. I really appreciate it.

**GOOGLE REP:** No problem. No problem. So, we implemented the ad conversion tracking. We verified this. I've showed you the reports. If you have any questions, you can respond to the same email. You can also call the toll-free number, 888-980-70545. I'll be sending you a confirmation email regarding what you did on call today.

**DAN:** Ok. Thank you. Have a great day.

**GOOGLE REP:** You too. Bye-bye.

Call ended. Dan toggles between a few open web browser tabs; Dan's cursor clicks on the HTML code for the Google Tag and next opens a new google tab and types "stan" in the search bar then stops screen share and video ends. The link for "docs.google.com/document/d/17p1fCYu9dCqGdB6yW_YwwMtZ" populates for a Google document entitled "Standup"







Loom  /  Getting Started  /  Share Your Recording

## Getting Started

Intro to Loom

Choose Your Recorder

Learn the Basics and Start Recording

Navigate Your Workspaces

**Share Your Recording**

How to archive or delete a space

How to use spaces

How to share your recording

How to embed your video into a webpage

**How to share your recording with specific people**

Sharing videos with your workspace

Viewing and Responding

## Recording & Editing

## Workspaces & Plans

## Settings & Billing

## Troubleshooting

## Recording Tips, FAQ & Security

# How to share your recording with specific people



Sharing with **specific people** provides an extra layer of video security. If your video contains sensitive information and you'd like to make sure only a specific person (or group of people) can watch your video you can enable these features.

This way you can be sure your Loom recording will only be seen by those it's intended for. This works in a similar way to sharing a Google Doc.

You can either...

⊘ **Share a public link** - allowing anyone with this link to view your video.

⊘ **Share with specific people** - allowing only people who have been invited to view your video.

⊘ **Share to Spaces** - allowing only specific groups within your workspace to view your video.

If you're a Loom **Business, Business+ AI** or **Enterprise** user, you can also add a password, allowing anyone with your video's password to view it. Enterprise users can also configure additional advanced privacy settings.

## How do I share my video with specific people?

01. From your video library, open the video you'd like to share with specific people.

02. Click on the **Share** button. Under **Link Settings**, select **Only people added can access**.





03. Type the email address of those you grant access to



04. Once you've done this, your **video will automatically be set to private** and inaccessible to anyone except those who have received access.

Please note



## Public Videos

If you want to make your video public, you can set your video to **Anyone with a Link** can view. This will ensure people with the video link can see your video. By default, your Loom URLs are **not searchable.**



## Share to Spaces

You can also share videos to the "All" space for your entire workspace to see or to a custom space with only specific users you've selected in your workspace.

How to share your recording with specific people - Loom





Anyone can create a space, name it, set privacy (open or closed), and invite members. Once a space is created, any member of it can invite others, add videos, and organize the space. Videos can be added to the space from the spaces page itself (by searching and inserting from your library), or they can be added by sharing a video to the space via the share modal or various quick share access points on the share page and video library thumbnails.

Questions, comments, concerns? Contact us here.

Happy recording!

Previous Article                                          Next Article

How to share your recording with specific people – Loom

 **loom**

# Need more help?

Connect with our team. We're here to help!

### Contact Support

### Contact Sales

**PRODUCT**

Pricing

loomSDK

Screen Recorder

Chrome Screen Recorder

Mac Screen Recorder

Windows Screen Recorder

iOS Screen Recorder

Android Screen Recorder

**USE CASES**

Team Alignment

Sales

Engineering

Design

Marketing

Product Management

Support

Education



Loom HQ                          Chrome Extension

Customers                        Mobile Apps

Security

Video Hosting

Video Library

**RESOURCES**                    **COMPANY**

Blog                             About Us

Help & Support                   Diversity, Equity & Inclusion

Community                        Careers

eBooks                           Newsroom

Status                           Media Kit

What's New                       Creator Program

Webcam Mic Test                  Sitemap

Webcam Recorder

        



**Exhibit 03 - Loom Video Recorded by D...**  516.4 MB

Modified: Friday, January 12, 2024 at 12:19 AM

Add Tags...

## ✓ General:

Kind: MPEG-4 movie
Size: 516,361,260 bytes (516.4 MB on disk)
Where: Macintosh HD ‣ Users ‣ home ‣ Dropbox (Personal) ‣
Confidential - Recoop's Exhibits
Created: Friday, January 12, 2024 at 12:19 AM
Modified: Friday, January 12, 2024 at 12:19 AM

☐ Stationery pad

☐ Locked

> More Info:

> Name & Extension:

> Comments:

> Open with:

## ✓ Preview:



> Sharing & Permissions:



meet.google.com is sharing a window.





Anastasia Alt <anastasia@getrecoop.com>

---

## Google Alert - daniel freed nootropics

**Google Alerts** <googlealerts-noreply@google.com>                Fri, Feb 21, 2025 at 8:00 PM
To: anastasia@getrecoop.com

 Alerts

### daniel freed nootropics

Daily update   ·   February 22, 2025

NEWS

---

**Nootropics** Co. Can't Push Nurse's Suit To Arbitration - Law360 Healthcare Authority
Law360
... drug test and be booted from the military, a Washington federal judge has ruled. Outliers Inc., which manufactures Thesis, and its CEO **Daniel Freed** ...

  Flag as irrelevant

---

See more results    |    Edit this alert

You have received this email because you have subscribed to **Google Alerts**.
Unsubscribe  |  View all your alerts

 Receive this alert as RSS feed

Send Feedback